UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| KIMBERLY A. ISAACSON and | ) | |
| ERIC C. ISAACSON, | ) | Case No. 13-20227 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| JOJI TAKADA, | ) | |
| | ) | Adversary No. 15-00883 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KIMBERLY A. ISAACSON and | ) | |
| ERIC C. ISAACSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter comes before the court on the adversary complaint filed by Joji Takada, not individually but as chapter 7 trustee for Eric and Kimberly Isaacson ("Debtors" or "Isaacsons"). Trustee seeks a determination that the Isaacsons are not entitled to a discharge in this case under 11 U.S.C.§§ 727(a)(4)(A) and (a)(6)(A).[1] Trustee argues that the Isaacsons should be denied their discharge for knowingly and fraudulently making a false oath at the time their original chapter 13 schedules were filed. After a hearing extending over four days, the court finds that the Trustee did not prove by a preponderance of the evidence that the Debtors knowingly and

---

[1] No evidence or argument concerning 11 U.S.C.§727(a)(6)(A) was presented and the court assumes that the Trustee is no longer pursuing revocation of discharge or other relief under §727(a)(6)(A). The relief sought under this count of the adversary complaint was for failure to turn over funds to the Trustee. The court notes that the Trustee appears to be holding funds resulting from the turnover of the Walmart stock in the approximate amount of $80,000 and also is holding the proceeds of the TCF savings account. Perhaps this is the reason that the Trustee appears to have abandoned Count II of the complaint.

fraudulently made false oaths or acted with reckless disregard for the truth in this bankruptcy proceeding.

## JURISDICTION AND VENUE

This matter arises out of an adversary proceeding brought in accordance with Rule 7001 of the Federal Rules of Bankruptcy Procedure. The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) and the Northern District of Illinois' Internal Operating Procedure 15(a). This adversary case is a "core" proceeding under 28 U.S.C. § 157(b)(2)(I) and 28 U.S.C. § 157(b)(2)(J). Venue in this district is proper pursuant to 28 § U.S.C. 1408 and 28 U.S.C. 1409(a).

## PROCEDURAL HISTORY

Eric and Kim Isaacson initially filed a chapter 13 case intending to retain possession of their property and to make structured plan payments through a chapter 13 plan. Due to the size of the claim of their principal creditor, BMO Harris, the Isaacsons did not qualify for relief under chapter 13 and converted their case to one under chapter 11.[2] Failing to gain the support of BMO Harris for their proposed chapter 11 plan, the case was converted to one under chapter 7. Although the adversary complaint in this case was filed by the chapter 7 trustee, the trustee is represented by counsel for BMO Harris and this proceeding has all the indicia of a two-party dispute in which BMO Harris pursues its last avenue to recoup a substantial unsecured deficiency claim.[3]

---

[2] See Case No.13-0227, [Dckt. 21] (BMO Harris filed an unsecured claim in the amount of $1,011,656.13. The $1,011,656.13 claim amount exceeded the unsecured debt limit of $383,175.00 effective 4/1/2013 under §109(e)). The case was ultimately converted to a chapter 11 on October 4, 2013. [Case No.13-20227, Dckt. 44].

[3] The stay was modified on October 16, 2013, to allow BMO Harris to sell the investment property leaving BMO with a substantial deficiency claim against the Isaacsons.

2

## EVIDENCE PRESENTED

The pertinent facts are drawn from the parties' pleadings, the exhibits attached thereto, the court's docket, as well as the testimony and various exhibits received into evidence during the hearing. During the hearing, the Trustee examined both Eric and Kimberly Isaacson as adverse witnesses. The Isaacsons' evidence consisted of testimony from each of them and their attorneys, Sarah Gray and David Lloyd. The parties have filed proposed findings of fact and conclusions of law and were allowed to make closing arguments in writing following the hearing. The court finds the facts are as follows.

## FACTUAL BACKGROUND

### I. Foreclosure against Investment Property

BMO Harris Bank and Debtors have been adverse for many years as a result of the Debtors' inability to satisfy their matured promissory note with BMO Harris. The note was secured by various mortgages on the Isaacsons' real estate investment property. The filing of the bankruptcy petition was precipitated by BMO Harris' motion to confirm the sale of the investment property in state court.

### II. Meeting with Attorney, Sarah Gray

On the eve of the confirmation of sale motion in state court, Debtors consulted bankruptcy counsel, Sarah Gray ("Gray") during the evening of May 13, 2013. The Isaacsons hoped to invoke the automatic stay by filing a chapter 13 bankruptcy and prevent the loss of the property. During that meeting, the Issacsons answered questions posed by Gray concerning their income, the content of their retirement accounts, real property, and personal property they owned (TR, Vol. 3, 39:23 – 40:19). Debtors provided Gray with paystubs, which included information about their earnings, bonuses, stock and 401(k) plan (TR, Vol. 3, 16:24 - 19:11). Gray asked

3

Debtors whether they owned Wal-Mart stock and the value of the stock (TR, Vol. 3, 23 - 47:6). To provide a precise answer during their meeting, Debtors called the company's informational 1-800 telephone number to obtain the stock's current value (TR, Vol. 3, 23 - 47:6). Gray asked Debtors what type of retirement accounts Wal-Mart provided to its employees. Debtors disclosed to Gray that their retirement accounts contained several hundred thousand dollars (TR, Vol.3, 37: 21 - 38:3). Gray advised her clients that the Wal-Mart stock they held outside their 401(k) in what was called "Walmart Stock Associate Purchase Plan"[4] was exempt, and unnecessary to include in their schedules.

Lastly, there was the question of whether or not Eric Isaacson would be receiving a year-end bonus for 2013. Eric Isaacson believed because the Wal-Mart store he managed would be undergoing an expensive remodeling, costing over a million dollars, (TR, Vol. 1, 74:17 – 23) he would not receive a bonus (TR, Vol.1 74:17 – 23). Because Eric believed there was no way to know for certain if he was to receive his bonus for 2013, no amount was included on his schedules (TR, Vol. 3, 34:2 – 11).

Debtors and Gray discussed the pending bankruptcy, with the last discussion ending at approximately 10:00 p.m. (TR, Vol. 4, 97:10). As Debtors answered Gray's questions, Gray entered information into a software program on her computer (TR, Vol. 4, 96: 25). Gray explained to Debtors that the filing was electronic and this is how filings were made. (TR, Vol.2, 46: 7 – 8) She did not print out a hard copy for their review (TR, Vol. 4, 96:1).

After the meeting concluded, Gray filed the chapter 13 petition, schedules, statement of financial affairs and proposed plan at 12:42 a.m. on May 14, 2013.[5]

---

[4] Walmart Associate Purchase Plan allows Walmart employees to purchase stock through paycheck deductions without any brokerage fees. (See TR, Vo.1 48:7 – 9).
[5] See Case No.15-0083, [Dckt.1]

At 6:39 a.m. the next morning, Debtors provided Gray with follow-up information, further detailing their stocks and retirement accounts.[6] After filing the bankruptcy petition and sending a follow-up email, Debtors asked if they needed to provide Gray with any additional information (TR, Vol. 3, 30:16- 20). Gray replied that no additional information was required (TR, Vol. 3, 30:16- 20). Despite Gray telling Debtors she would update their information, Gray testified that she did not amend the previously filed schedules. (TR, Vol. 3: 130). In spite of the information provided to their counsel, the Isaacsons' schedules filed in the early morning hours of May 14, 2013 contained information that was not accurate and omitted the listing of certain assets which should have been contained in the filing. Debtors did not know until many months later that the information provided to Gray was not included on the original schedules and that amendments were not made (TR, 3, 49:6 – 10). Gray testified that throughout her meeting with them, Debtors acted in a forthright and honest manner, listing all of their assets, including jewelry and artwork owned (TR, Vol. 3, 24:10 – 15).

### III.    Meetings with Attorney, David Lloyd

Once it became clear that Debtors did not qualify for relief under Chapter 13, the case was converted to chapter 11 (TR, Vol. 3, 48:13 – 17) and Gray referred Debtors to attorney David Lloyd ("Lloyd") (TR, vol. 4, 5:21- 6: 14). Lloyd was described to the Debtors as an attorney familiar with chapter 11 bankruptcies. After reviewing the schedules and meeting with the Isaacsons, Lloyd determined that Debtors' original schedules required amendments (TR, Vol. 4, 9:24 – 25). Specifically, Lloyd believed that Debtors' Wal-Mart stock should be listed on the

---

[6] (D. Ex. 12) (Email from Eric Isaacson to Sarah Gray forwarding financial statements provided from the Isaacsons to BMO Harris regarding their home loan. Documents include: personal statements, income statements, and balance sheets.)

5

schedules and listed as an exempt asset (TR, Vol. 4, 21: 3-5). Again, Debtor Eric Isaacson explained the bonus system at Wal-Mart, and that due to a forthcoming remodeling of Eric's store, he did not expect to receive a bonus as he had in previous years (TR, Vol. 3, 34: 12-20). Lloyd represented to the United States Trustee at the section 341 meeting that the schedules would be revised following the meeting.[7]

Debtors' amended schedules were prepared in October and November 2013 (TR, Vol. 4, 12:22 – 13:7), but due to some personnel problems in Lloyd's office, were not filed until the end of December 2013 (TR, Vol. 3, 50:17 – 22). Later in the proceedings, the exemption of the Wal-Mart stock was challenged and this court ruled that although the stock was held in an investment titled "Walmart Stock Associate Purchase Plan," it was not held in a ERISA qualifying account and therefore was not exempt.[8] Following the ruling, the Isaacsons turned over the Wal-Mart stock to the chapter 7 trustee.

## DISCUSSION

### Section 727(a)(4)(A)

#### I. Burden of Proof

Section 727(a)(4) is designed to ensure that debtors "provide reliable information to parties with an interest in the administration of the estate. *Britton Motor Service, Inc. v. Krich (In re Krich)*, 97 B.R. 919, 923 (Bankr.N.D.Ill.1988). In order to prevail on its objection to the Debtors' discharge under 727(a)(4), the Trustee must show, by a preponderance of the evidence that (1) the Debtors made a statement under oath; (2) the statement was false; (3) the Debtors knew the statement was false; (4) the Debtors made the statement with fraudulent intent; and (5)

---

[7] Meeting of creditors held on November 19, 2014, Case No.13-20227 [Dckt.56].
[8] Case. No.13-20227 [Dckt. 118](Order entered by Judge Eugene Wedoff granting BMO Harris' objection to Debtors' exemption of Walmart stock.)

the statement related materially to the bankruptcy case. *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011). A deliberate false statement under oath is not the only avenue to demonstrate fraudulent intent as fraudulent intent to deceive can also be shown when a debtor acts with a reckless disregard for the truth. *In re Katsman*, 771 F.3d 1048, 1050 (7th Cir. 2014) *see also Stamat*, 635 F.3d at 978; *In re Yonikus*, 974 F.2d 901, 905 (7th Cir.1992). Because errors made during the course of bankruptcy vary in impact on the proceedings, the totality of a debtor's errors and omissions may be considered to determine whether there is fraudulent intent. *Stamat*, 635 F.3d at 982.

Viewing the totality of the evidence presented herein, construing exceptions to discharge strictly against the creditor as instructed by *Stamat* and *In re Kontrick*, 295 F.3d 724, 736 (7th Cir.2002) (quoting *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir.1985)), the court finds that the Trustee has not met his burden of proof under the standards set forth by the Seventh Circuit.

## II. Debtors' Schedules Constitute Statements Made Under Oath and Contained Mistakes

There is no question that the Isaacsons submitted their schedules under oath. There is also no dispute that the schedules as originally filed contained mistakes or false statements. Thus, the first two requirements are met and the court reviews the other requirements under Section 727(a)(4).

## III. Mistakes in Debtors Schedules Do Not Constitute False Oaths

Debtors are not expected to know all of the intricacies of the Bankruptcy Code and therefore mistakes—even multiple mistakes—made during the course of bankruptcy are not necessarily made with fraudulent intent. *In re Kempff*, 2017 WL 396590 (7th Cir. January 30, 2017); *in re Artstein*, 455 B.R. 689 (Bankr. N.D. Ill. 2011). The debtor in the *Artstein* case failed to disclose in his statement of financial affairs that his residence was held in a trust. He

disclosed the ownership interest elsewhere on his schedules and therefore did not demonstrate an intent to deceive but merely that he did not understand the law of real property or the nature of a land trust. The court did not find that Artstein should be denied a discharge under "false oath" theory as it reasoned that even failure to disclose a prepetition transfer into a family trust did not amount to fraud or knowing concealment as the actual interest in the property had been disclosed. *Id.* at 693. Likewise, in *Kempff*, the court found that the mistakes the debtor made on her schedules were not caused by fraudulent intent but were caused by misunderstanding by the debtor or incompetent legal advice from her attorney. As a result, the Appellate Court upheld the lower courts' findings.

Similarly, Debtors' omissions do not constitute false oaths. Debtors disclosed the contents of their retirement accounts and stocks on multiple occasions—including to creditor BMO Harris in numerous financial statements submitted annually to the Bank.[9] Debtors were forthright when examined at the first section 341 meeting held in the chapter 11 portion of the case and the information was provided in the amendments later filed. Once the Debtors realized that the 401(k) accounts did not include a value on the schedules and that the Wal-Mart stock should be listed, they took active steps to make sure that the schedules were corrected. Like the *Artsein* court, this court does not hold Debtors' statements to be intentional "false oaths."

### IV. Debtors Did Not Know their Schedules and Amended Schedules Contained Mistakes

Prior to leaving Sarah Gray's office, Debtors executed the signature block of the Statement of Financial Affairs,[10] stating that they had reviewed the information being provided and that it was accurate. The Debtors testified repeatedly and consistently that they provided

---

[9] *Supra* FN 11 (email to Sarah Gray forwarding BMO Harris documents completed when Debtors took out the loan on their property).
[10] See Case No.13-20227 [Dckt.1].

8

accurate information to their attorneys. In fact, Eric testified that after questioning Gray about the e-filing, she assured him that this was how it was done and Eric never thought that he would necessarily have a hard copy to review. After meeting in Gray's office, Debtors returned home at 10:00 PM but by 6:45 a.m. the next morning emailed Gray the additional information concerning the exact amount in the 401(k) accounts.[11] Gray, then told Debtors that she would update the information on their schedules to reflect the current information. Gray failed to update Debtors' information, however, and failed to inform Debtors of her omission. Because Debtors were operating under the assumption that Gray updated their schedules, Debtors were completely unaware of the omission of the value of the 401(k) accounts.

## V.     Reliance on Attorney Advice Demonstrates Debtors' Lack of Intent to Deceive

What is notably missing from the evidence presented, is any allegation or evidence that Debtors acted with an overt intent to deceive any party during the course of the bankruptcy proceedings. Intent to defraud requires a material representation that is known to be false, or, an omission that the declarant knows will create an erroneous impression. *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) (Holding that an executive knowingly made material misrepresentations when he failed to list his position as president of the company or his stock ownership in his schedules).

Trustee and BMO Harris argue, that "an attorney's conduct must be imputed to his client in any context." *U.S. v. DiMucci*, 879 F.2d 1488, 1496 (7th Cir.1989). "Ultimately, it is debtors who are responsible for the accuracy of the information contained in their bankruptcy schedules and statement of affairs [and] it is they who have the duty to carefully consider all of the questions posed and to see that they are completely and correctly answered." *Watson v. Moss*,

---

[11] *Supra* FN 11.

9

619 F.2d 775, 776 (8th Cir.1980). While debtors are responsible for the information contained in schedules and statements of financial affairs, the court finds that it would be unjust to hold them responsible if, as in this case, the Debtors supplied the correct information to counsel which was not incorporated into the filed papers. Moreover, the Debtors were not aware that the information they provided to counsel was not incorporated into their schedules. Courts evaluating similar situations have found that that "the Debtor's reliance in fact on counsel to complete the form in a way responsive to the statutory requirements bolsters a finding of no knowledge or fraudulent intent on the Debtor's part." *In re Radloff*, 418 B.R. 316, 326 (Bankr.D.Minn.2009) (Debtor providing raw data to attorney regarding income was not denied discharge because counsel did not correctly complete papers for the Means Test form); *see also*, *In re O'Neill*, 468 B.R. 308, 341 (Bankr. N.D. Ill. 2012) (Holding debtor relied on his attorney and believed in good faith that filings were complete and accurate, thus the amended filings showed that debtor was not knowingly filing false pleadings or acting with reckless disregard); *In re Kempff*, 2017 WL 396590, *5 (7th Cir. January 30, 2017) (debtor's testimony about advice from her bankruptcy attorney is one kind of evidence that may tend to negate fraudulent intent).

Over the course of four days at trial, Trustee's counsel examined both Debtors repeatedly to determine if they intended to deceive creditors by the omissions in their schedules. Each time, Debtors answered that they affirmatively disclosed all information to their attorney, and never acted with the intent to deceive any creditor or the trustee. Trustee's counsel asked Debtor Eric Isaacson about his testimony at the 341 meeting:

Trustee's Counsel: "So you testified at the 341—the 341 meeting on November 19, 2013, that the information contained in the schedules filed on May 14, 2013, were true and correct?"

Debtor: "That is what I believed at that time, yes."[12]

When Trustee's counsel pointed out to Debtor that there were errors in the schedules presented at the 341 meeting, Trustee's Counsel asked:

> "So that statement was false, correct?" Debtor responded "I don't—I can't say that that statement was false because, again, we were told they were exempt." [13]

Again, upon cross-examination of Debtor, Eric Isaacson, Trustee's counsel asked:

> "So you swore under penalty of perjury that the information contained in the schedules was true and correct. Correct?"

Again, Debtor responded, that the schedules were correct to the best of his knowledge at the time,[14] in the same breath continuing:

> "Mr. Rubin, I went through this before. I already explained to you that Ms. Gray told me that was the way this had to be done, that she… she told me that that's the way it was supposed to be done, that that's the way you have to file this, that you have to do it electronically, and you have to sign this declaration or whatever it is." [15]

The court had ample opportunity to observe the Debtors' demeanor and forthright answers. Both Debtors appeared to have a high regard for honesty and seemed intent on providing accurate information to their attorneys. Debtors' attorney, Gray, testified that the Debtors gave honest and complete answers over the course of their meeting.[16] She further

---

[12] (TR, Vol. 2, 50:19 – 24).
[13] (TR, Vol. 2, 53: 1 – 5).
[14] (TR, Vol. 3, 62:6 – 10).
[15] (TR, Vol.3, 62:16 – 18)
[16] (TR, Vol. 3, 106: 23 – 107:6).

testified that it was her mistake that the omissions were not immediately corrected and not the Debtors'.[17] The court finds that the Debtors did not act with intent to deceive creditors, this court or the Trustee.

### VI. Plaintiff Failed to Demonstrate Debtors Acted with Reckless Disregard for the Truth Through the Course of their Bankruptcy Proceedings

Throughout the hearing, the Trustee argued that Debtors acted with reckless disregard for the truth and accuracy of information on their schedules. Reckless disregard means "not caring whether some representation is true or false." *In re Chavin*, 150 F.3d at 728. *See also, In re Diodati*, 9 B.R. 804, 809 (Bankr.D.Mass.1981) (quoting *Le Lievre v. Gould*, 1 Q.B. 491,498(1893)). This court has found no evidence that the Isaacsons were cavalier with the truth and in fact were quite conscience concerning it. Debtors were very concerned that their schedules, statement of financial affairs and other filings were complete and honest.

Courts frequently find evidence of reckless disregard when debtors execute schedules without reviewing or caring about the accuracy. Trustee relies on *In re Jakovljevic-Ostojic*, 517 B.R. 119, 130 (Bankr. N.D. Ill. 2014) (Holding debtor has repeatedly erred in her actions in a way that supports an extravagant lifestyle while at the same time evidencing a cavalier attitude toward her creditors and the court, warranting a finding of reckless disregard). The Debtors in the instant case demonstrated quite the opposite as they were scrupulous in providing information to each of their attorneys and had no knowledge that their original schedules were not accurate. Debtors initiated communications concerning the case with both attorneys, following up with questions and concerns. Once Debtors received court documents regarding their chapter 13 case, Debtors emailed Gray asking—if they were required to pay off their credit

---

[17] (TR, Vol. 4, 83:5-15). Ms. Gray testified that she was in fact sleep deprived when she was inputting the information for the Debtors' chapter 13 petition as she had recently given birth to twins. Ms. Gray accepted complete responsibility for the omitted information as to the amount of the 401(k) accounts.

cards, if their LLC was required to file bankruptcy, at what point should a chapter 11 attorney be contacted and – critically— "What is our strategy and how are you and Arnold working on our case?"[18]

After the 341 meeting held in November 2013, Debtors again initiated a follow up, this time with attorney Lloyd. Specifically, Debtor Eric Isaacson emailed concerning 1) the changes he believed needed to be made to the schedules; 2) his desire to have Lloyd review Debtors' concerns and make the changes necessary to Debtors' schedules; and 3) to forward a dated copy of the newly filed amended schedules back to Debtors.[19] Debtors' repeated efforts to provide updated information to both attorneys representing them in various stages of bankruptcy demonstrated to the court that they were forthright and honest debtors.[20]

## VII. Debtors Acted with Immediacy Once the Error in Their Schedules Were Discovered

Throughout their bankruptcy proceedings, the Isaacsons relied upon their attorneys. Plaintiff argued that the Isaacsons should be held to a higher standard even though once the mistake was realized, amendments were filed. Generally, although debtors are bound by their representations in their schedules, debtors are released if once the mistake is realized, there is a swift attempt to rectify the mistake and submit the proper information. In *Cannon-Stokes v. Potter* 453 F.3d 446, 448 (7th Cir. 2006); *Viette v. Hosp. Staffing Inc.*, No. 12 C 2327, 2013 WL 2450101, at *3 (N.D. Ill. June 5, 2013). Here, Debtors did just that. As soon as the errors in their

---

[18] See Ds. Ex.1, p.2 (email from Eric Isaacson dated May 22, 2013, asking attorney Gray follow up questions regarding the Isaacson's case.)
[19] See Ds. Ex.2, p1. (email from Eric Isaacson dated December 4, 2013, updating attorney Lloyd as to the changes Isaacson believed necessary.)
[20] See Ds. Ex. 1 (Email correspondence dated May 22- 24, 2013; between the Isaacsons and Sarah Gray providing updated information regarding the Debtors' finances); Ds. Ex. 2 (Email correspondence dated December 4, 2013; December 25, 2013; December 28-29, 2013; between the Isaacsons and David Lloyd detailing the changes to Debtors' schedules).

schedules came to light, they immediately spoke with their attorney and the previous omissions were corrected in their schedules.

## VIII. Debtors' Omission Did Not Materially Impact the Administration of the Estate

Finally, the court looked to determine whether the unintentional omissions hindered the administration of this case. *In re Agnew*, 818 F.2d 1284, 1290 (7th Cir.1987) (Holding materiality element not satisfied under § 727(a)(4) where proceeds from sale of asset subject to false oath could not have been reached by creditors to satisfy debts); *In re Calisoff*, 92 B.R. 346 (Bankr.N.D.Ill.1988) ( Holding debtor's only record was a checkbook which he kept until just before dissolution proceeding, at which time he failed to maintain any records, and thus established failure to keep records for the denial of discharge).

During the course of the trial, Plaintiff never presented evidence that Debtors' errors in either the original or the amended schedules impeded the administration of the estate. The Trustee has possession of the Wal-Mart stock and the Debtors have turned over their savings accounts. The automatic stay was modified to allow BMO to complete its foreclosure and sell the income property. The 401(k) accounts contain exempt property under Illinois law and are not reachable by the Trustee or BMO Harris. The court is not aware of any property that was not turned over to the Trustee as a result of the initial omissions on the schedules. The court finds no reason to believe Debtors' actions delayed the bankruptcy proceedings so egregiously as to negatively impact the administration of the estate.

## CONCLUSION

When weighing the facts regarding each asset not contained in the initial schedules, having construed the evidence herein against the creditor and liberally in favor of the Debtor and viewing the Debtors' errors and omissions in their totality, the court finds that Debtors did not

knowingly and fraudulently make false oaths and did not act with reckless disregard for the truth as to the content of their schedules. Judgment in favor of the Debtors will be entered and denied for the Trustee.

    A separate order shall be entered.

ENTER:

                                                      */s/ Deborah L. Thorne*
                                                      Deborah L. Thorne
                                                      United States Bankruptcy Judge

Dated: February 16, 2017